**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

FOUNTAIN LAKES ASSOCIATES, L.P.          CIVIL ACTION NO. 02-2193

VERSUS                                    JUDGE S. MAURICE HICKS, JR.

RED RIVER ROOFING AND RESTORATION,        MAGISTRATE JUDGE HORNSBY
INC., ET AL.

**MEMORANDUM RULING**

This matter came before the Court for a bench trial on October 25-26, 2006. Plaintiff Fountain Lakes Associates, L.P. ("Fountain Lakes") filed suit in October 2002 for the recovery of sums paid for, and damages attendant upon, roofing work performed on its apartment buildings in Bossier City, Louisiana.  At the time of trial, five defendants remained.[1] Defendants Vanguard Coatings, Inc. ("Vanguard"), Jeff Folsom ("Folsom"), and ARCJF, Inc. ("ARCJF") appeared at trial.  Red River Roofing and Restoration, Inc. ("Red River") and Alpine Roofing Construction, Inc. ("Alpine Roofing") failed to appear at trial. The Court recently entered default judgment against Red River and dismissed Alpine Roofing for failure to prosecute under LR 41.3W.  For the following reasons, the Court finds that judgment shall be rendered in favor of Defendants Vanguard, Folsom, and ARCJF.

---

[1]Defendant Scott Wear, the owner of Alpine Roofing Construction, Inc., was dismissed from this suit on March 1, 2004.  See Record Document 34.

**FINDINGS OF FACT**[2]

Fountain Lakes purchased an apartment complex, located at 3325 East Texas Street in Bossier City, Louisiana, from Charan Industries ("Charan") on March 1, 2001. See Record Document 70, Stipulation of Fact No. 8. The apartment complex consists of two buildings, each containing 122 apartment units. See id., Stipulation of Fact No. 6. Prior to the sale of the apartment complex, Charan contracted with Red River to replace the roofs on the apartment buildings. See id., Stipulation of Fact No. 9. Each roof has approximately 55,000 square feet. See id., Stipulation of Fact No. 7. The cost of the roofing job was approximately $366,000. See Fountain Lakes Trial Exhibit 7.

The estimate/proposal submitted by Red River on May 18, 2000, and later accepted by Charan, stated that Red River would "remove [the] existing flat roof down to decking." Fountain Lakes' Trial Exhibit 7. The estimate further proposed replacement of the old roofing system with either a modified bitumen roof or an "SBS Butyl Rubber Built Up System." See Record Document 70, Stipulation of Fact No. 10. Red River represented that the "SBS Butyl Rubber Built Up System"[3] would be the superior roof and was

---

[2]The Court supplements the stipulated facts contained in the pretrial order (Record Document 70) with trial testimony and information from documentary evidence presented during the bench trial of the instant matter.

[3]Red River's proposal, which later became the contract after it was signed by Charan, defined the "SBS Butyl Rubber Built Up System" as follows:

This system is applied by installing an ISO insulation board to the decking with screws. Then applying a light coating over the seams. We then apply non-granulated 90# roll roofing to the ISO Board by way of plates and screws which penetrate the decking. We then secure all seams with polyester, mastic and or butyl tape. We then apply 3 gallons of Butyl Rubber per 100 square feet of roof. This is applied by way of two coats. Each coat taking 24 hours to cure or dry. The advantages of this system are it takes 10 to 12

accompanied by a warranty of ten years on labor and materials.  <u>See id.</u>, Stipulation of Fact No. 10; <u>see also</u> Fountain Lakes Trial Exhibit 7.  Charan chose the "SBS Butyl Rubber Built Up System," which used a butyl rubber coating manufactured/produced by Vanguard.  <u>See id.</u>, Stipulation of Fact Nos. 10-11.  Red River purchased the butyl rubber coating from Roofing Supply, Inc., a Vanguard distributor in Shreveport, Louisiana.  <u>See</u> Testimony of Joe Byley.  Neither Fountain Lakes nor Charan had a direct contract with Vanguard.  <u>See</u> Testimony of William Koch and Norman Florence.

The butyl rubber coating manufactured by Vanguard is not intended to be used as a roofing material in and of itself and is not a substitute for a complete roofing system.  <u>See id.</u>  Instead, the intended use of the coating is as a maintenance/repair product, or as a coating for a roofing system.  <u>See id.</u>  Further, the trial testimony of William Koch ("Koch") and Norman Florence ("Florence"), both principals of Vanguard, established that Vanguard does not represent its coating product as a replacement for a roofing system.  The record evidence clearly demonstrates that when used for its intended purpose, the butyl rubber coating manufactured by Vanguard is not a defective product.[4]  The evidence presented at trial also established that no person from Vanguard saw the estimate that Red River

_____

weeks to complete the entire complex.  Cost wise the materials are much higher but our labor is much less due to the faster application time.  Second the system itself has no seams.  This system is like putting a rubber glove over the roof.  The only disadvantage is the color of the roof fading to a dull gray.  However, in this case appearance is a non-factor.  This system is much more efficient and the warranty is 10 years on labor and 10 years on material.

Fountain Lakes Trial Exhibit 7.

[4]The sole expert witness at trial did not offer any opinion as to whether any Vanguard product was defective.  <u>See</u> Testimony of Plaintiff's Expert, Raymond Ramos.

prepared for Charan.  See Testimony of Joe Byley, William Koch, and Norman Florence.

Further, Koch testified that he had no part in designing the "SBS Butyl Rubber Built Up

System" included in Red River's estimate and that he thought he was selling the Vanguard

coating product to be applied over a new modified bitumen roof and that the old, existing

roof would be removed.

At the request of Red River, Koch faxed a copy of Vanguard's warranty to a Charan

representative in Baton Rouge, Louisiana.  See Testimony of William Koch; see also

Fountain Lakes' Trial Exhibit 5.  However, both Koch and Florence testified that Vanguard

never promised to issue or actually issued such an express warranty with respect to its

coating product as applied to the apartments to any person at Red River, Charan, or

Fountain Lakes.  According to Koch and Florence, Vanguard would not have issued any

express warranty with respect to the coating installed at the apartments pursuant to the

installation plan outlined in Red River's proposal to Charan, as such proposal was an

inadequate roofing system.  Further, even if Vanguard had issued an express warranty,

such warranty would have only covered "coating leaks as a result of [deterioration due to]

ordinary weather conditions."  Fountain Lakes Trial Exhibit 5.  The express warranty would

not have covered any leaks caused by:

> Damage to the coating resulting from cracks or openings in the roof
> substrate.
>
> Improper preparation or defects in the substrate, errors in the roofing system,
> lack of positive drainage, or any other latent defects.

Id.

Red River installed the "SBS Butyl Rubber Built Up System" on the roofs of both

apartment buildings.  See Record Document 70, Stipulation of Fact No. 12.  However,

despite the express language of the contract stating that Red River would remove the existing flat roof, Joe Byley ("Byley"), a former principal of Red River, testified that it was later determined that "SBS Butyl Rubber Built Up System" did not require the removal of the existing roof, except for a small portion on one of the buildings for the purpose of spot repairs.  The first problems with the roofing system began appearing in the summer of 2000.  See Testimony of Joe Byley.  Specifically, Byley testified that there was separation of seams and delamination of the roofs.

Koch testified that he was present at the job site "many times" and that he observed problems with the roofing job.  Specifically, Koch noted that there were insulation boards and rolled roof stacked up and exposed to the elements.  Koch recommended to Red River that the materials be covered with a tarp.  Koch also observed that while the old roof was removed from the back building, Red River did not tear off and remove the existing roof on the front apartment building.  He questioned this practice and was told by Zann Mullins ("Mullins"), another former principal of Red River, that the apartment owner or manager had approved such practice in order to save time.  Koch also recalled that Red River began using drywall screws, not roofing screws, for fastening.  He informed Red River of the impropriety of using the drywall screws, but the practice continued.  Further, Koch testified that he was called to the job site by Mullins to observe ponding water on the roof of the back building.  Koch stated that while he could not pinpoint one specific leak, it was apparent that there were multiple leaks.  He also noted seam separation, cracking, and the lack of metal flashing on the edge of the roof.  Koch instructed Mullins to apply mastic and polyester fabric to the areas experiencing cracking and also advised Mullins that he should install metal flashing at the roof's edge.  Finally, Koch testified that he took photographs

of the roofs because he was concerned about the improper installation of the roof and because his suggestions to Red River were being ignored.  See generally Testimony of William Koch.

There was already significant leaking in the roofs of the apartment buildings in March 2001, when title passed from Charan to Fountain Lakes.  In a March 15, 2001 memo, Fountain Lakes outlined the extensive leaks and demanded that Red River, pursuant to the rights and warranties under the contract, resolve the leaks immediately. See Fountain Lakes Trial Exhibit 9.  Throughout the summer of 2001, Red River made numerous attempts to repair the host of leaks that were developing on the roofs of the apartments.  See Record Document 70, Stipulation of Fact No. 13.  In July or August 2001, Red River abandoned all efforts to repair the leaks.

After Red River abandoned its repair effects, Fountain Lakes began calling independent roofing companies to repair the roofs.  See Testimony of Brian Becker.  One of the companies contacted by Fountain Lakes was Alpine Roofing, which was owned by Scott Wear ("Wear") and operated out of Dallas, Texas.  See Testimony of Jeff Folsom. Folsom, who had been friends with Wear for years, persuaded Wear to open a satellite office of Alpine Roofing in Dallas due to recent hail storms in the areas.  See id.  In the year 2000, Wear agreed and offered Folsom a position with Alpine Roofing, specifically for the purpose of creating a website and helping with marketing efforts.  See id.  Folsom accepted the position and began working with Alpine Roofing in the summer of 2000.  See id.  In lieu of a salary or hourly wages, Folsom earned 20% of any sale he handled on the front end.  See id.  Folsom was not given any ownership interest in Alpine Roofing.  See id.  In October 2001, Folsom had been working for Wear for a little over a year and

estimated that he had earned approximately $60,000 to $70,000; yet, Folsom had only received about $10,000.  See id.

Folsom testified that the website he created linked an email account and that one of his daily tasks was to review the email account.  See id.  Alpine Roofing received an email from Fountain Lakes.  See id.  Folsom responded and Wear later made a phone call to Fountain Lakes.  See id.  Fountain Lakes requested that Alpine Roofing come and inspect the roofs of the apartment buildings in Bossier City.  See id.

On October 8, 2001, Wear and Folsom visited the apartments and inspected the roofs.  See id.  Folsom testified that he had no roofing experience at this time and that Wear developed the roofing repair method/strategy.  See id.  On that same date, Wear dictated a roofing repair contract to Folsom, who typed the contract simultaneously with the dictation.  See id.; see also Fountain Lakes Trial Exhibit 10.  The contract was signed by Brian Becker ("Becker") on behalf of Fountain Lakes and Scott Wear on behalf of Alpine Roofing.  See Fountain Lakes Trial Exhibit 10.  Folsom and ARCJF were not parties to the contract.  The work to be performed under the contract included:

1. Repair thirty seven (37) known leaks across entire structure (attached in exhibit A)
2. Cut damaged area's [sic], peal [sic] back roofing system and mop hot asphalt
3. Install modified bitumen over exposed area's [sic]
4. Asphalt all penetrations and a/c curbs
5. Replace all roof drains

Id.  The contract amount was $75,000.  See id.  The contract further provided that "all work performed by Alpine is guaranteed to complete satisfaction two (2) years on all area's [sic] Alpine Roofing, Inc. has repaired."  Id.  Becker, President of Fountain Lakes, testified that he knew Alpine Roofing's repairs would not be permanent, but he believed that the leaks

would stop and that he relied on the two year guaranty.  On November 20, 2001, Fountain Lakes paid Alpine Roofing $40,000 as an "up front" installment for the roofing repair work. See Fountain Lakes Trial Exhibit 11.  This check was endorsed "ARC." See id.

Within a couple of weeks of executing the contract, Wear and a crew of laborers under his direction began performing repair work on the roofs. See Testimony of Jeff Folsom.  Donald Ferguson ("Ferguson"), maintenance supervisor of the apartments, testified that he saw Wear's crews applying hot asphalt to the top coat of the roofing material, but he did not see the crews split the existing roof open and peel it back.  Wear and his crew completed the repair work for the original 37 leaks contemplated by the contract.  See id.  Folsom did not participate in any of the work performed to repair the original 37 leaks.  See id.  According to Ferguson, who was mandated by his superiors to observe the roofing repairs,  Wear was in charge not only on the day that the roofing repair contract was signed, but also over the period of time that repairs were made.

On December 10, 2001, Fountain Lakes issued a check to Alpine Roofing in the amount of $25,000. See Fountain Lakes Trial Exhibit 11.  The check was again endorsed "ARC." See id.  Becker testified that he would not have issued this check unless the roofing job was substantially complete.  Becker further testified that he withheld the final payment until it rained.  According to Ferguson, Alpine Roofing's repair of the original 37 leaks appeared to reduce the leaking problems for approximately two months.  On January 18, 2002, Fountain Lakes issued another check to Alpine Roofing in the amount of $10,000, which brought the total amount paid to Alpine Roofing to $75,000. See id.  This check was endorsed "ARCJF, Inc." See id.  Becker testified that he issued this check because the job was complete and the leaks appeared to be abated.  Folsom testified that

Page 8 of  22

he endorsed this $10,000 check, stating that Wear gave him permission to sign the check and keep the money in payment for back commissions owed.

However, after the January 2002 check was issued, the roofs resumed leaking. <u>See</u> Testimony of Donald Ferguson.  Ferguson testified that while the leaks were postponed for several rains, they would "always return no matter what anyone put on the roof." Ferguson stated that he first attempted to call Wear to come and repair the leaks, but had no luck in reaching Wear after several attempts.  Ferguson then called Folsom, who responded to the calls, returned to the job site multiple times, and attempted to effect the repairs.  <u>See id.</u>  Folsom testified that even at this time he had very little roofing experience.  Folsom returned to the apartments because Wear asked him to go, as he was "part of the sale;" he knew Wear was not dependable; he was a service oriented person; and he wanted to maintain a good professional reputation.[5]  <u>See</u> Testimony of Jeff Folsom. Folsom further stated that one of the crew members suggested to him what he felt should be done to repair the roofs.  Folsom and his crews could not identify specific leaks, but Ferguson had a diagram of the apartments that were leaking so the crews had a general idea of where the leaks were.  <u>See id.</u>  Folsom and his crews generously applied hot

---

[5]On October 19, 2001, Folsom formed a corporation, ARCJF, Inc.  <u>See</u> Testimony of Jeff Folsom; Folsom and ARCJF Trial Exhibit 2.  According to Folsom, he started this new corporation to disassociate himself with Wear, who was a "train wreck."  Further, Folsom wanted to distance himself from the existing entity Alpine Roofing because of all of the problems centered around Wear's action, or lack thereof.  Folsom admitted that "ARCJF" is an acronym for Alpine Roofing Construction Jeff Folsom.  Further, Folsom testified that he began using the Alpine Roofing website, which he created, for his own corporation because he had already successfully done the marketing, the efforts he had put into developing the website itself, and Wear was continuing to string him along financially.  According to Folsom, ARCJF, Inc. secured it first roofing job in January 2002.

asphalt to those areas.  See id.  Yet, according to Ferguson, new leaks continued to develop despite the repeated repair attempts.

On March 20, 2002, Fountain Lakes issued a check to Alpine Roofing in the amount of $4,500.  See Fountain Lakes Trial Exhibit 11.  The check was endorsed "ARC" and also contained another illegible signature above "ARC."[6]  See id.  Becker testified that the $4,500 check was in payment for further repairs performed by Folsom based on an oral agreement.  Specifically, Becker stated that Folsom, who was at the apartments to make roofing repairs under the warranty provisions of the October 2001 contract, made repairs to some balconies and walkways.

On June 24, 2002, Fountain Lakes issued another check to Alpine Roofing in the amount of $2,500.  See id.  The check was endorsed "ARC."  See id.  Becker testified that the $2,500 check was in payment for Folsom's repair of five new leaks that were not covered by the original October 2001 contract.  Becker further stated that he believed Folsom's repair work continued past June 24, 2002.  The repair work stopped in late summer 2002 when Fountain Lakes ceased calling Folsom because Becker realized that the repair effects were not working and he was going to have to purchase a whole new roof.  See Testimony of Brian Becker.

In August 2002, Gold Star Construction & Roofing, Inc. ("Gold Star") prepared a General Roof System Survey.  See Fountain Lakes Trial Exhibit 15.  The survey noted that

---

[6]Folsom admitted that he endorsed this check above Wear's "ARC" signature, again stating that Wear gave him permission to endorse the check and keep the money as payment for back commissions.

the existing system was a "Vanguard Elastomeric Coating" and that there was a complete system failure.  Id.  The survey noted several membrane defects:

> Improper thickness of coating - water trapped between roof systems, metal detail inadequate, base flashing improperly installed or non-existent. Insulation fasteners backing through surface, system contraction creating tears in surface.

Id.  Gold Star was later retained to replace the roofs on the apartment buildings at a cost of approximately $362,000.  See Fountain Lakes Trial Exhibits 16 & 17.

### CONCLUSIONS OF LAW

The events at issues in this case all occurred in Louisiana and the Court's subject matter jurisdiction is based on diversity of citizenship.  Thus, Louisiana substantive law applies to the instant matter.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938); Batts v. Tow-Motor Forklift Co., 66 F. 3d 743, 750 (5th Cir. 1995).

**I.   Vanguard.**

Again, Vanguard is the manufacturer of the butyl rubber coating used as a component part of the the "SBS Butyl Rubber Built Up System" at issue in the case. Fountain Lakes argues that Vanguard's products were defective;[7] that Vanguard participated in the design of the "SBS Butyl Rubber Built Up System," which Fountain Lakes contends was defective; that Vanguard negligently trained Red River as to the proper application of its products; and that Vanguard is a co-warrantor of the roof. Fountain Lakes also contends that the materials supplied by Vanguard were not suitable for the intended purpose, a fact that was known, or should have been known to Vanguard.

---

[7]With this allegation, Fountain Lakes appears to be asserting a redhibition claim under Louisiana Civil Code Article 2520, which states in pertinent part that "the seller warrants the buyer against redhibitory defects, or vices, in the thing sold."

Finally, Fountain Lakes contends that Vanguard should be held liable under the "Good Samaritan Doctrine" as set forth in Section 324A of the Restatement (Second) of Torts. The Court will examine each of these claims separately.

In its post-trial memorandum, Fountain Lakes seems to concede that Vanguard's products are not defective.[8]  Notwithstanding, the Court finds that the evidence presented at trial failed to establish that any product supplied by Vanguard was defective.  Fountain Lakes' expert did not testify as to the composition of Vanguard products or offer an expert opinion that Vanguard's products were defective.  Simply put, there is no evidence in the record indicating Vanguard's product was in any way defective.

Relying on the testimony of Byley, Fountain Lakes maintains that Vanguard participated in the design of the "SBS Butyl Rubber Built Up System."  Here, the Court must weigh and balance the testimony of Byley and Koch.  Byley testified that most of the discussions about the roofing project would have been between his co-principals, Mullins and James "Chip" Martin, and Koch.  Thus, as argued by Vanguard, Byley is in no position to know the details of those discussions and what part Koch played, if any, in the design of the roofing system that Red River presented to Charan.  Further, Byley admitted that he knew little or nothing about roofing design or construction at the time of the roofing project at issue in this case.  Conversely, this Court heard testimony from Koch, who it considers

---

[8]In its post-trial memorandum, Fountain Lakes stated:

Vanguard observes that no defect in the SBS butyl rubber material itself has been asserted in this case.  The observation is correct.  The material itself was not the culprit.

Record Document 98 at 7.

to be a very knowledgeable witness due to his 30 years of experience in the roofing business, that he did not have anything to do with the roof design, specifically stating that he did not see the proposed design until several weeks before the trial of this case. Further, according to Koch, Red River led him to believe that the Vanguard products would be applied over a new modified bitumen roof and that the old, existing roof would be removed.  During trial and in its briefs, Fountain Lakes repeatedly focused on Koch's conversations with Charan to "help sell the job," but the Court finds that the job Koch was attempting to sell was Vanguard coating over a *new* modified bitumen roof, not the "SBS Butyl Rubber Built Up System" contained in Red River's written proposal to Charan.  Koch further testified that once he had the opportunity to view Red River's design, he knew the roofing system was not appropriate.  Based on Koch's vast array of knowledge and experience, the Court finds that it is simply not plausible to believe that Koch would have suggested and/or designed such a use of Vanguard roofing products outside of their normal intended uses.  Accordingly, this Court makes a credibility call and finds that Koch did not participate in any way in the design of the "SBS Butyl Rubber Built Up System" proposed by Red River to Charan.

Next, Fountain Lakes argues that Vanguard negligently trained Red River as to the proper application of its products.  Notwithstanding Vanguard's position that there is no negligent training cause of action under Louisiana law, this Court finds no evidence of inadequate training in this case.  First, Fountain Lakes presented scant evidence on the issue of Vanguard training.  Byley testified that he did not receive training from Vanguard. Instead, Chip Martin and others from Red River received the training offered by Vanguard as to the proper application of Vanguard's products.  Thus, Byley has no personal

knowledge of training; therefore, he can not offer any real details as to the adequacy, or inadequacy, of Vanguard's training.  Conversely, Vanguard offered extensive evidence on the issue of training as to the proper application of its roofing products for their intended purpose.   For instance, Koch testified that he provided such training to Red River personnel for four or more jobs prior to the job at issue in this case.  The Court heard no testimony indicating that there were roof leak problems with these jobs.  Finally, even if there was evidence of inadequate training, there is nothing in the record to indicate that such training caused the roof leaks at the Fountain Lakes roofing job.  Rather, the record evidence clearly established that it was Red River's negligence in designing, and installing, the roofing system, irrespective of the application of the Vanguard products, that caused the problems at the Fountain Lakes job.

Fountain Lakes next contends that Vanguard is a co-warrantor of the roof.  It is not readily apparent whether this claim is premised on Louisiana Civil Code Article 2524, which will be discussed later in this ruling, or the argument that Vanguard issued an express warranty in this case.  The Court will address both arguments, beginning with the question of whether Vanguard issued an express warranty.  There is no dispute that before Charan accepted Red River's proposal, Koch faxed a copy of Vanguard's standard warranty to a Charan representative in Baton Rouge, Louisiana.   Yet, this Court finds by a preponderance of the evidence that Vanguard did not actually issue an express warranty in this case.  Both Koch and Florence testified extensively about Vanguard's warranty process and both men were adamant in stating that Vanguard never promised, nor issued, an express warranty with respect to its coating product as applied to the Fountain Lakes apartment buildings.  As stated by Koch and Florence, this Court questions whether

Vanguard would have even considered issuing an express warranty with respect to the Fountain Lakes job, as Vanguard had not seen the roofing proposal, which Koch later found to be inadequate, at the time the agreement between Charan and Red River was reached.  Notwithstanding, even if Vanguard had issued an express warranty in this case, it is likely that such warranty would not apply in this instance as the warranty covered "coating leaks as a result of [deterioration due to] ordinary weather conditions."  Fountain Lakes Trial Exhibit 5.  Here, it can easily be argued that the coating leaks were caused by "cracks or openings in the roof substrate" or "improper preparation or defects in the substrate, errors in the roofing system, lack of positive drainage or any other latent defects" – all of which are causes specifically excluded by the clear language of the purported express warranty in this case.  Id.  Thus, the Court finds that Fountain Lakes has failed to prove by the preponderance of the evidence that an express warranty was issued by Vanguard in this case and/or that any damages would have been recoverable under such a warranty.

Fountain Lakes also contends that the materials supplied by Vanguard were not suitable for Red River's intended purpose, a fact that was known, or should have been known to Vanguard.  With this allegation, Fountain Lakes appears to be asserting a claim under Article 2524, which states in pertinent part:

> The thing sold must be reasonably fit for its ordinary use.
>
> When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.

There is no question that Vanguard's butyl rubber coating was reasonably fit for its intended use as a maintenance/repair product or as a coating for a roofing system. Likewise, there is no dispute that Vanguard's butyl rubber coating was not fit for use in Red River's "SBS Butyl Rubber Built Up System," as there is ample evidence in the record that such system employed the coating as more of a roofing system and not a maintenance, repair, or prolonging product.  However, again crediting the testimony of  Koch, this Court finds that Vanguard had no reason to know of the use Red River intended for its butyl rubber coating product.  In previous jobs, Red River had properly applied the coating. Further, both Koch and Florence testified that it was their belief that the old, existing roof would be removed and that Vanguard's product would be applied over a new modified bitumen roof, not as some sort of substitute for a roofing system.  Accordingly, the Court finds no liability under Article 2524.

Finally, in its post-trial memorandum, Fountain Lakes asserts the "Good Samaritan Doctrine" as a basis for tortious liability against Vanguard.  See Record Document 103 at 3.  Fountain Lakes argues that Koch undertook the training of Red River personnel, participated in the actual application of Vanguard products, observed and photographed problems at the job site, and continued to sell and gratuitously provide Vanguard's products for incorporation into a defective roof; yet, he "maintained a stony silence with regard to the owner, the third party for whose ostensible benefit the roof was applied." Id. at 4.  In Bujol v. Entergy Services, Inc., Nos. 2003-0492, 2003-0502 (La. 5/25/04), 922 So.2d 1113, 1128, the Louisiana Supreme Court  (La. 2004) discussed Section 324A of the Restatement (Second) of Torts, which provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [perform] his undertaking, if

   (a)   his failure to exercise reasonable care increases the risk of harm, or

   (b)   he has undertaken to perform a duty owed by the other to the third person, or

   (c)   the harm is suffered because of reliance of the other or the third person upon the undertaking.

Id.  The Bujol court went on to state that "this common law doctrine has existed for centuries and has traditionally been used to impose liability upon an actor who has failed to exercise reasonable care when it undertook to perform a duty owed to a third party."  Id.

The Court is not inclined to apply Section 324A in this instance.  Bujol addressed the application of the Section 324A in the context of employees who died as a result of an oxygen flash fire at the air-separation plant where they were employed and ultimately concluded that Section 324A was not applicable.  Here, we have a case where the "physical harm" pertains to a building, not an individual.  Further, the Court is not prepared to equate Koch's failure to alert Charan or Fountain Lakes as to the his concerns regarding the roof's installation with a complete failure to exercise reasonable care.  Accordingly, the Court imposes no liability against Vanguard on the basis of the "Good Samaritan Doctrine."

Fountain Lakes has failed to meet its burden of establishing by a preponderance of the evidence that Vanguard's products were defective; that Vanguard participated in the design of the "SBS Butyl Rubber Built Up System"; that Vanguard negligently trained Red River as to the proper application of its products; that Vanguard is a co-warrantor of the

roof; or that Vanguard had reason to know that Red River was going to use the coating products as a roofing system and not a maintenance, repair, or prolonging product. Further, the Court declines to apply the "Good Samaritan Doctrine" as set forth in Section 324A of the Restatement (Second) of Torts.  All of Fountain Lakes' claims against Vanguard are dismissed with prejudice and judgment is rendered in favor of Vanguard.[9]

## II.    Folsom and ARCJF.

Fountain Lakes contends that defendants Folsom and ARCJF, along with Scott Wear and Alpine Roofing, should be held liable on three grounds, specifically that they: (1) "misrepresented the suitability of the repairs they proposed; (2) failed to effect the repairs [in a] workmanlike manner; and (3) when called upon to remedy the defects in the repair work walked off the job."  Record Document 70 at 6.  Further, based on Fountain Lakes' post-trial brief, it appears that Fountain Lakes is proceeding against Folsom and ARCJF in contract, not tort.  See Record Document 98 at 11-13.

At the outset, the Court finds as matter of law that Folsom and ARCJF were not parties to the October 8, 2001 roofing repair contract.  The contract itself clearly evidences

---

[9]Vanguard also argues that Fountain Lakes' tort and redhibition claims have prescribed.  Louisiana law provides that a plaintiff need not know all the extent of his damages for the time period for bringing suit to begin.  See Division Place Partnership v. Carl E. Woodward, Inc., 2000-2151 (La. App. 4th Cir. 1/16/2002), 806 So. 2d 912; Clofer v. Celotex Corp., 528 So. 2d 1074 (La. App. 5th Cir. 1988); Brookshire Bros. Holdings, Inc. v. Total Containment, Inc., 2006 WL 2548185 (W.D.La. 9/1/2006).  Based on this principle, Vanguard argues that Fountain Lakes was aware of the extensive leaking of the roof systems in March 2001 when Becker sent Byley a detailed memorandum setting forth the problems that Fountain Lakes was experiencing.  Vanguard also notes that Becker sent a copy of the memorandum to his counsel in this case at that time.  Accordingly, Fountain Lakes had sufficient knowledge of significant problems with the roof in March 2001, more than a year prior to filing this action in October 2002.  While this argument is persuasive, the Court will not reach a ruling on the issue of prescription, as Vanguard prevails on the merits of Fountain Lakes' tort and redhibition claims.

that the contracting parties are Alpine Roofing and Fountain Lakes.  The contract bears the signature of Wear, not Folsom, and contains no mention of ARCJF, which was not even incorporated at the time the contract was executed.  Further, Fountain Lakes' argument that Folsom's endorsement and cashing of certain checks somehow exposes  him or ARCJF to liability under the contract is unpersuasive.   The Court finds Folsom's explanation of such actions credible and wholly plausible in light of Wear's erratic history.  Simply put, Wear and Alpine Roofing, not Folsom or ARCJF, are the parties who could potentially be liable under the October 2001 contract and both have both been dismissed from this lawsuit for failure to prosecute.  Notwithstanding these legal findings, Fountain Lakes claims against Folsom and ARCJF also fail on additional grounds.

Fountain Lakes failed to present any evidence establishing by a preponderance of the evidence that Folsom made any representations, or misrepresentations, about the suitability of the proposed repair strategy.  The testimony of both Folsom and Ferguson demonstrates that Wear proposed the repair strategy and that Folsom, who was not an experienced roofer at the time the contract was executed, played no part in designing the repairs, much less representing their suitability.  Even when Folsom returned to the job site in early 2002, he still had very little roofing experience and had to rely on an experienced member of his crew to suggest what repairs were necessary.

Likewise, Fountain Lakes has failed to meet its burden regarding its allegation that Folsom failed to effectuate repairs in a workmanlike manner.  First and foremost, Fountain Lakes' expert witness provided no testimony as to the quality of the roofing repairs provided by Folsom.  The Court did hear testimony from Ferguson on the issue of the repair work performed under the October 2001 contract.  Specifically, Ferguson stated that

he did not see Alpine Roofing's crews  splitting and peeling back the existing roof open and peel it back.  Yet, he admitted that the repairs stopped the leaks for several rains, but that the leaks would "always return no matter what anyone put on the roof."  Moreover, even if this Court were to the repairs performed pursuant to the October 2001 contract were not done in a workmanlike manner, the liability for the unsuitability of the repairs would be imputed to Folsom's employer and the contracting party, Alpine Roofing.

Finally, Fountain Lakes' own witnesses admitted that Folsom did not walk off the job.  Rather, the testimony established that Wear would not respond to phone calls, so Ferguson was forced to call on Folsom, who responded to the calls, returned to the job site multiple times, and attempted to effect the repairs.  Folsom's repair attempts stopped in late summer 2002 because Fountain Lakes quit calling Folsom when Becker realized that he was going to have to purchase a whole new roof.

The reasoning set forth above also applies to ARCJF.  Fountain Lakes has failed to prove by a preponderance of the evidence that ARCJF had any involvement in the roofing repair contract or in performing the repair roof under that contract.  Likewise, there is no scintilla of evidence that ARCJF misrepresented the suitability of repairs, failed to effectuate repairs in a workmanlike manner, or walked off the job.  There is simply no basis for imposing liability against ARCJF.[10]

---

[10]At trial and in its post-trial memorandum, Fountain Lakes asserts the alter ego theory, piercing the corporate veil, and corporate successor liability as additional bases for recovery.  However, as raised by Folsom and ARCJF during trial and in their post-trial memorandum, Fountain lakes failed to plead these theories in either the complaint or the pretrial order.

In Kona Technology Corp. v. Southern Pacific Transp. Co., 225 F.3d 595 (5th Cir. 2000), the Fifth Circuit stated:

Fountain Lakes has failed to meet its burden of establishing by a preponderance of the evidence that Folsom or ARCJF misrepresented the suitability of the repairs they proposed, failed to effect the repairs in a workmanlike manner, or walked off the job. Accordingly, all of Fountain Lakes' claims against Folsom and ARCJF are dismissed with prejudice and judgment is rendered in favor of Folsom and ARCJF.[11]

## CONCLUSION

Based on the foregoing, judgment is hereby rendered in favor of Vanguard, Folsom, and ARCJF and all of Fountain Lakes' claims against these defendants are dismissed with prejudice.

---

It is a well-settled ruled that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial. The claims, issues, and evidence are narrowed by the pretrial order to expedite the proceeding. Once the pretrial order is entered, it controls the scope and course of the trial. If a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint.

Id. at 604 (internal citations omitted). The Fifth Circuit has also reasoned that "it goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented at trial without objection." Arsement v. Spinnaker Exploration Co., LLC, 400 F.3d 238, 245 (5th Cir. 2005) (citations omitted). Here, Fountain Lakes did not raise the aforementioned theories of recovery in its complaint or the pretrial order, and Folsom and ARCJF objected on this basis during trial. Accordingly, an award under either of these theories is precluded.

[11]Like Vanguard, Folsom and ARCJF have asserted the defense of prescription and also challenge this Court's personal jurisdiction. However, because Folsom and ARCJF prevail on the merits of Fountain Lakes' claims against them, the Court will not reach a ruling on the issues of prescription and personal jurisdiction.

A judgment consistent with this Memorandum Ruling will issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 17th day of September, 2007.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE